UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| RICHARD LOBEVERO, Individually and On Behalf of All Others Similarly Situated, | Case No. |
| Plaintiff, | CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| v. | |
| JPMORGAN CHASE & CO., JAMES DIMON, JENNIFER PIEPSZAK, and MARIANNE LAKE, | JURY TRIAL DEMANDED |
| Defendants. | |

Plaintiff Richard Lobevero ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding JPMorgan Chase & Co. ("JPMorgan" or the "Company"), and information readily obtainable on the Internet.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons or entities that purchased or otherwise acquired JPMorgan securities between February 23, 2016

and September 23, 2020, inclusive (the "Class Period").  Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

4.      Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)), as the alleged misstatements entered and the subsequent damages took place in this Judicial District.  Pursuant to JPMorgan's most recent annual report on Form 10-K, as of January 31, 2020, there were 3,073,976,616 shares of the Company's common stock outstanding.  JPMorgan's common stock trades on the New York Stock Exchange ("NYSE").  Accordingly, there are presumably hundreds, if not thousands, of investors in JPMorgan's common stock located within the U.S., some of whom undoubtedly reside in this Judicial District.

5.      In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the U.S. mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.      Plaintiff, as set forth in the accompanying Certification, incorporated by reference herein, purchased JPMorgan securities during the Class Period and was economically damaged thereby.

7.      Defendant JPMorgan purports to operate as a financial services company worldwide.   The Company operates in four segments: Consumer & Community Banking, Corporate & Investment Bank, Commercial Banking, and Asset & Wealth Management. JPMorgan is incorporated in Delaware with headquarters at 383 Madison Avenue, New York, New York.  JPMorgan's securities trade on NYSE under the ticker symbol "JPM."

8.      Defendant James Dimon ("Dimon") served as the Company's Chief Executive Officer and Chairman of the Board of Directors throughout the Class Period.

9.      Defendant Jennifer Piepszak ("Piepszak") has served as the Company's Chief Financial Officer ("CFO") since May 1, 2019.

10.     Defendant Marianne Lake ("Lake") served as the Company's CFO from 2013 until April 30, 2019.

11.     Defendants Dimon, Piepszak, and Lake are collectively referred to herein as the "Individual Defendants."

12.     Each of the Individual Defendants: (i) directly participated in the management of the Company; (ii) was directly involved in the day-to-day operations of the Company at the highest levels; (iii) was privy to confidential proprietary information concerning the Company and its business and operations; (iv) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein; (v) was directly or indirectly involved in the oversight or implementation of the Company's internal controls; (vi) was aware of or recklessly disregarded the fact that the false and misleading

3

statements were being issued concerning the Company; and/or (vii) approved or ratified these statements in violation of the federal securities laws.

13.     JPMorgan is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

14.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to JPMorgan under *respondeat superior* and agency principles.

15.     Defendants JPMorgan and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

16.     From approximately January 1, 2009 until December 31, 2015, traders at the Company manipulated the prices of precious metals futures and options contracts using a technique called "spoofing" whereby traders placed electronic orders to buy and sell such futures contracts with the intent to cancel those orders before execution.  Such spoof orders injected materially false and illegitimate signals of supply and demand into the market and were intended to induce other market participants to trade against Defendants' genuine orders (*i.e.*, orders that Defendants did want to execute).

17.     The Precious Metals Desk and Treasuries Desk traders, on behalf of JPMorgan, placed bids and offers for certain gold, silver, platinum, palladium, Treasury note, and Treasury bond futures contracts traded on Commodity Exchange, Inc. ("COMEX"), the New York Mercantile Exchange ("NYMEX"), and the Chicago Board of Trade ("CBOT"), which are futures exchanges and Designated Contract Markets owned and operated by CME Group Inc. ("CME").

JPMorgan traders placed hundreds of thousands of orders to buy or sell futures contracts with the intent to cancel them before execution, intentionally sending false signals of supply or demand designed to deceive market participants into executing against other orders they wanted filled.

18.     The spoof orders were designed to, and did, artificially move the prices of such precious metals futures and options contracts to prices that were more favorable to J.P. Morgan, creating a false appearance of activity in the market and induced other market participants to trade at more favorable prices.

**Materially False and Misleading Statements Issued During the Class Period**

19.     The Class Period begins on February 23, 2016, when the Company filed its annual report on Form 10-K for the year ended December 31, 2015 with the SEC (the "2015 10-K").  The 2015 10-K was signed by Defendants Dimon and Lake.  The 2015 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Dimon and Lake attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

20.     Concerning the Company's trading in precious metals, the 2015 10-K stated that "[i]n the physical commodity markets, the Firm primarily purchases and sells precious and base metals and may hold other commodities inventories under financing and other arrangements with clients."

21.     The 2015 10-K stated that the Company secured $842 million in revenue through the physical commodity markets in 2015, $1,663 million in revenue in 2014, and $2,083 million in revenue in 2013.

22.     Further, the 2015 10-K stated that physical commodities were valued "using observable market prices or data" and that "[c]ommodity derivatives [were] frequently used to manage the Firm's risk exposure to its physical commodities inventories."

23.     On February 28, 2017, the Company filed its annual report on Form 10-K for the year ended December 31, 2016 with the SEC (the "2016 10-K"). The 2016 10-K was signed by Defendants Dimon and Lake.  The 2016 10-K contained signed SOX certifications by Defendants Dimon and Lake attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

24.     Concerning the Company's trading in precious metals, the 2016 10-K stated that "[i]n the physical commodity markets, the Firm primarily purchases and sells precious and base metals and may hold other commodities inventories under financing and other arrangements with clients."

25.     The 2016 10-K stated that the Company secured $1,067 million in revenue through the physical commodity markets in 2016, $842 million in revenue in 2015, and $1,663 million in revenue in 2014.

26.     Further, the 2016 10-K stated that physical commodities were valued "using observable market prices or data" and that "[c]ommodity derivatives [were] frequently used to manage the Firm's risk exposure to its physical commodities inventories."

27.     On February 27, 2018, the Company filed its annual report on Form 10-K for the year ended December 31, 2017 with the SEC (the "2017 10-K").  The 2017 10-K was signed by Defendants Dimon and Lake.  The 2017 10-K contained signed SOX certifications by Defendants Dimon and Lake attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

28.     Concerning the Company's trading in precious metals, the 2017 10-K stated that "[i]n the physical commodity markets, the Firm primarily purchases and sells precious and base metals and may hold other commodities inventories under financing and other arrangements with clients."

29.     The 2017 10-K stated that the Company secured $661 million in revenue through the physical commodity markets in 2017, $1,067 million in revenue in 2016, and $842 million in revenue in 2015.

30.     Further, the 2017 10-K stated that physical commodities were valued "using observable market prices or data" and that "[c]ommodity derivatives [were] frequently used to manage the Firm's risk exposure to its physical commodities inventories."

31.     On February 26, 2019, the Company filed its annual report on Form 10-K for the year ended December 31, 2018 with the SEC (the "2018 10-K").  The 2018 10-K was signed by Defendants Dimon and Lake.  The 2018 10-K contained signed SOX certifications by Defendants Dimon and Lake attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

32.     The 2018 10-K stated the following concerning the precious metals manipulation scheme:

*Precious Metals Investigations and Litigation*. Various authorities, including the Department of Justice's Criminal Division, are conducting investigations relating to trading practices in the precious metals markets and related conduct. The Firm is responding to and cooperating with these investigations. Several putative class action complaints have been filed in the United States District Court for the Southern District of New York against the Firm and certain current and former employees, alleging a precious metals futures and options price manipulation scheme in violation of the Commodity Exchange Act. The Firm is also a defendant in a consolidated action filed in the United States District Court for the Southern District of New York alleging monopolization of silver futures in violation of the Sherman Act.

33.     On February 25, 2020, the Company filed its annual report on Form 10-K for the year ended December 31, 2019 with the SEC (the "2019 10-K").  The 2019 10-K was signed by Defendants Dimon and Piepszak.   The 2019 10-K contained signed SOX certifications by Defendants Dimon and Piepszak attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

34.     The 2019 10-K stated the following concerning the precious metals manipulation scheme:

> *Metals and U.S. Treasuries Investigations and Litigation and Related Inquiries.* Various authorities, including the Department of Justice's Criminal Division, are conducting investigations relating to trading practices in the metals markets and related conduct. The Firm also is responding to related requests concerning similar trading-practices issues in markets for other financial instruments, such as U.S. Treasuries. The Firm continues to cooperate with these investigations and is currently engaged in discussions with various regulators about resolving their respective investigations. There is no assurance that such discussions will result in settlements. Several putative class action complaints have been filed in the United States District Court for the Southern District of New York against the Firm and certain former employees, alleging a precious metals futures and options price manipulation scheme in violation of the Commodity Exchange Act. Some of the complaints also allege unjust enrichment and deceptive acts or practices under the General Business Law of the State of New York. The Court consolidated these putative class actions in February 2019. The Firm is also a defendant in a consolidated action filed in the United States District Court for the Southern District of New York alleging monopolization of silver futures in violation of the Sherman Act.

35.     The statements contained in ¶¶ 19-34 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) traders at the Company, with the knowledge and consent of their superiors, manipulated the precious metals market by "spoofing," or placing fake orders to

generate the appearance of market demand; (ii) the Company had insufficient controls and compliance protocols to enable it to identify and stop the misconduct; (iii) the Company's earnings in the physical commodity market were, at least in part, ill-gotten; (iv) such conduct would result in enhanced regulatory scrutiny; (v) the Company provided misleading information to Commodity Futures Trading Commission ("CFTC") investigators at early stages of the investigation into the misconduct; (vi) resolution of the governmental investigation into the Company would foreseeably result in a significant fine; and (vii) as a result, Defendants' statements about its business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**The Truth Begins to Emerge**

36.     On November 6, 2018, the Department of Justice ("DOJ") announced in a press release that former JPMorgan precious metals trader John Edmonds pleaded guilty to commodities fraud and spoofing conspiracy.  The press release stated, in pertinent part, the following:

> A former precious metals trader at a United States bank (Bank) pleaded guilty in a proceeding unsealed yesterday to commodities fraud and a spoofing conspiracy in connection with his participation in fraudulent and deceptive trading activity in the precious metals futures contracts markets.
>
> * * *
>
> John Edmonds, 36, of Brooklyn, New York, pleaded guilty under seal on Oct. 9 in the District of Connecticut to an information charging him with one count of commodities fraud and one count of conspiracy to commit wire fraud, commodities fraud, commodities price manipulation and spoofing. Sentencing is scheduled for Dec. 19 before U.S. District Judge Robert N. Chatigny of the District of Connecticut.
>
> * * *
>
> As part of his plea, Edmonds admitted that from approximately 2009 through 2015, he conspired with other precious metals traders at the Bank to manipulate the markets for gold, silver, platinum and palladium futures contracts traded on the New York Mercantile Exchange Inc. (NYMEX) and Commodity Exchange Inc. (COMEX), which are commodities exchanges operated by CME Group Inc.

9

Edmonds and his fellow precious metals traders at the Bank routinely placed orders for precious metals futures contracts with the intent to cancel those orders before execution (the Spoof Orders), he admitted. This trading strategy was admittedly intended to inject materially false and misleading liquidity and price information into the precious metals futures contracts markets by placing the Spoof Orders in order to deceive other market participants about the existence of supply and demand. The Spoof Orders were designed to artificially move the price of precious metals futures contracts in a direction that was favorable to Edmonds and his co-conspirators at the Bank, to the detriment of other market participants. In pleading guilty, Edmonds admitted that he learned this deceptive trading strategy from more senior traders at the Bank, and he personally deployed this strategy hundreds of times with the knowledge and consent of his immediate supervisors.

37.   On August 20, 2019, the DOJ announced that another JPMorgan employee, Christian Trunz, pled guilty to spoofing charges, and had done so with the knowledge and consent of his supervisors.  The press release stated, in relevant part:

> Christian Trunz, 34, of London, England, pleaded guilty in the Eastern District of New York to an information charging him with one count of conspiracy to engage in spoofing and one count of spoofing. Today's pleas were accepted by U.S. District Judge Pamela K. Chen. Sentencing is scheduled for Feb. 19, 2020. Trunz resigned from his position as an Executive Director at Bank A earlier today.
>
> According to admissions made as part of his plea and other statements made in court, between approximately July 2007 and August 2016, Trunz placed thousands of orders that he did not intend to execute for gold, silver, platinum and palladium futures contracts traded on the New York Mercantile Exchange Inc. (NYMEX) and Commodity Exchange Inc. (COMEX), which are commodities exchanges operated by CME Group Inc. **Trunz learned to spoof from more senior traders, and spoofed with the knowledge and consent of his supervisors.**

(Emphasis added.)

38.   On September 23, 2020, *Bloomberg* reported that the Company was nearing a settlement to resolve the spoofing charges.  According to sources, the settlement was to be for a record nearly $1 billion.  The article stated, in pertinent part:

> JPMorgan . . . is poised to pay close to $1 billion to resolve market manipulation investigations by U.S. authorities into its trading of metals futures and Treasury securities, according to three people with knowledge of the matter.

The potential record for a settlement involving alleged spoofing could be announced as soon as this week, said the people who asked not to be named because the details haven't yet been finalized. The accord would end probes by the Justice Department, the Commodity Futures Trading Commission and the Securities and Exchange Commission into whether traders on JPMorgan's precious metals and treasuries desks rigged markets, two of the people said.

A penalty approaching $1 billion would far exceed previous spoofing-related fines. It would also be on par with sanctions in many prior manipulation cases, including some brought several years ago against banks for allegedly rigging benchmark interest rates and foreign exchange markets.

\* \* \*

The government's settlement with JPMorgan is not expected to result in any restrictions on its business practices, said one person familiar with the negotiations between authorities and the bank. It is anticipated that JPMorgan will admit to wrongdoing.

\* \* \*

The pending spoofing case against JPMorgan follows criminal charges filed last year against several of its employees, including former head of the precious metals desk, Michael Nowak. In that case, the Justice Department used racketeering laws more commonly used in mafia and drug gang prosecutions, alleging the precious metals desk effectively became a criminal enterprise for eight years.

Nowak and three others accused in the case pleaded not guilty and are seeking to have the charges dismissed. Two other former traders have pleaded guilty to conspiracy claims and are cooperating.

39.     On this news, shares of JPMorgan stock fell $1.53 per share, or approximately 2%, to close at $92.74 per share on September 23, 2020.

40.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**Post-Class Period Developments**

41.     On September 29, 2020, the CFTC formally announced that it had ordered JPMorgan to pay $920 million to settle the spoofing and manipulation charges.  According to the

order, the Company failed to monitor its employees and ignored multiple red flags.  The Company

also provided the CFTC with misleading information.  The CFTC's press release stated, in relevant

part:

> Washington, D.C. — The Commodity Futures Trading Commission today issued an order filing and settling charges against JPMorgan Chase & Company (JPMC & Co.) and its subsidiaries, JPMorgan Chase Bank, N.A., and J.P. Morgan Securities LLC (JPMS) (collectively, JPM), for manipulative and deceptive conduct and spoofing that spanned at least eight years and involved hundreds of thousands of spoof orders in precious metals and U.S. Treasury futures contracts on the Commodity Exchange, Inc., the New York Mercantile Exchange, and the Chicago Board of Trade. This case is brought in connection with the Division of Enforcement's Spoofing Task Force.

> The order finds that JPM's illegal trading significantly benefited JPM and harmed other market participants. ***JPM is required to pay a total of $920.2 million—the largest amount of monetary relief ever imposed by the CFTC—including the highest restitution ($311,737,008), disgorgement ($172,034,790), and civil monetary penalty ($436,431,811) amounts in any spoofing case.***

> "Spoofing is illegal—pure and simple," said CFTC Chairman Heath P. Tarbert. "This record-setting enforcement action demonstrates the CFTC's commitment to being tough on those who intentionally break our rules, no matter who they are. Attempts to manipulate our markets won't be tolerated. The CFTC will take all steps necessary to investigate and prosecute illegal activities that could ultimately undermine the integrity of the American free enterprise system."

> * * *

> The CFTC has previously issued orders in related matters filing and settling charges of spoofing against two traders, both of whom have entered into formal cooperation agreements with the CFTC: John Edmonds [See CFTC Press Release No. 7983-19] and Christian Trunz [See CFTC Press Release No. 8014-19]. In another related matter, the CFTC continues to pursue civil litigation against two other traders, Michael Nowak and Gregg Smith, for spoofing and attempted price manipulation [See CFTC Press Release No. 8013-19].

> Case Background

> The order finds that, from at least 2008 through 2016, JPM, through numerous traders on its precious metals and Treasuries trading desks, including the heads of both desks, placed hundreds of thousands of orders to buy or sell certain gold, silver, platinum, palladium, Treasury note, and Treasury bond futures contracts with the intent to cancel those orders prior to execution. Through these spoof orders,

the traders intentionally sent false signals of supply or demand designed to deceive market participants into executing against other orders they wanted filled. According to the order, in many instances, JPM traders acted with the intent to manipulate market prices and ultimately did cause artificial prices.

*The order also finds that JPMS, a registered futures commission merchant, failed to identify, investigate, and stop the misconduct. The order states that despite numerous red flags, including internal surveillance alerts, inquiries from CME and the CFTC, and internal allegations of misconduct from a JPM trader, JPMS failed to provide supervision to its employees sufficient to enable JPMS to identify, adequately investigate, and put a stop to the misconduct.*

*The order notes that during the early stages of the Division of Enforcement's investigation, JPM responded to certain information requests in a manner that resulted in the Division being misled. The order recognizes, however, JPM's significant cooperation in the later stages of the investigation.*

(Emphases added.)

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

42.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons or entities other than Defendants that purchased or otherwise acquired JPMorgan securities during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of JPMorgan, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

43.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, JPMorgan securities were actively traded on NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

44. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

45. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

46. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition and business JPMorgan;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused JPMorgan to issue false and misleading SEC filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false statements and SEC filings;

- whether the prices of JPMorgan securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

47.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

48.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- JPMorgan shares met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

- As a public issuer, JPMorgan filed periodic public reports with the SEC and NYSE;

- JPMorgan regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

- JPMorgan was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

49.     Based on the foregoing, the market for JPMorgan securities promptly digested current information regarding JPMorgan from all publicly available sources and reflected such information in the prices of the Company's shares, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

50.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

51.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

52.     This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

53.     During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

16

54.     Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of JPMorgan securities during the Class Period.

55.     Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of JPMorgan were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.  These defendants by virtue of their receipt of information reflecting the true facts of JPMorgan, their control over, and/or receipt and/or modification of JPMorgan's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning JPMorgan, participated in the fraudulent scheme alleged herein.

56.     The Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and

disclose the true facts in the statements made by them or other JPMorgan personnel to members of the investing public, including Plaintiff and the Class.

57.     As a result of the foregoing, the market price of JPMorgan securities was artificially inflated during the Class Period.  In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of JPMorgan securities during the Class Period in purchasing JPMorgan securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

58.     Had Plaintiff and the other members of the Class been aware that the market price of JPMorgan securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased JPMorgan securities at the artificially inflated prices that they did, or at all.

59.     As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

60.     By reason of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of JPMorgan securities during the Class Period.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

61.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

62.     During the Class Period, the Individual Defendants participated in the operation and management of JPMorgan, and conducted and participated, directly and indirectly, in the conduct of JPMorgan's business affairs.  Because of their senior positions, they knew the adverse non-public information about JPMorgan's misstatement of revenue and profit and false financial statements.

63.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to JPMorgan's financial condition and results of operations, and to correct promptly any public statements issued by JPMorgan which had become materially false or misleading.

64.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which JPMorgan disseminated in the marketplace during the Class Period concerning JPMorgan's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause JPMorgan to engage in the wrongful acts complained of herein.  The Individual Defendants, therefore, were "controlling persons" of JPMorgan within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of JPMorgan securities.

65.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by JPMorgan.

### **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of Plaintiff and the Class, prays for judgment and relief as follows:

A.      Declaring this action to be a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiff's counsel as Lead Counsel;

B.      Awarding damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

C.      Awarding Plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding Plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  November 17, 2020

Respectfully submitted,

POMERANTZ LLP

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
ahood@pomlaw.com

POMERANTZ LLP
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
pdahlstrom@pomlaw.com

BRONSTEIN, GEWIRTZ &
GROSSMAN, LLC
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
peretz@bgandg.com

*Attorneys for Plaintiff*

Monday, October 26, 2020

# JPMorgan (JPM)

## CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

1.  I make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2. I have reviewed a Complaint against JPMorgan Chase & Co. ("JPMorgan" or the "Company") and authorize the filing of a comparable complaint on my behalf.

3.  I did not purchase or acquire JPMorgan securities at the direction of plaintiffs counsel, or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.   I am willing to serve as a representative party on behalf of a Class of investors who purchased or acquired JPMorgan securities during the class period, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.  To the best of my current knowledge, the attached sheet lists all of my transactions in JPMorgan securities during the Class Period as specified in the Complaint.

6.   During the three-year period preceding the date on which this Certification is signed, I have not sought to serve as a representative party on behalf of a class under the federal securities laws.

7.   I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.   I declare under penalty of perjury that the foregoing is true and correct.


**Name**


**Print Name**

richard lobevero

**Signature**

1





REDACTED

REDACTED



**JPMorgan Chase & Co. (2020)**                                           **Lobevero, Richard**

### List of Purchases and Sales

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| Purchase | 6/5/2020 | 500 | $110.9000 |